## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, | No. 18-305-4-CR-S-RK |
| Plaintiff, | 18 U.S.C. § 371 |
| | NMT 5 Years Imprisonment |
| | NMT $250,000 Fine |
| v. | NMT 3 Years Supervised Release |
| | Mandatory Restitution |
| **EDDIE WAYNE COOPER** | Class D Felony |
| [DOB: 03/02/1966], | |
| | Forfeiture Allegation |
| Defendant. | 18 U.S.C. § 981(a)(1)(C) and |
| | 28 U.S.C. § 2461 |
| | |
| | $100 Special Assessment |

### I N F O R M A T I O N

**THE UNITED STATES ATTORNEY CHARGES THAT:**

At all times material to this Information, unless otherwise set forth, with all dates and times alleged to be "on or about" or "in or about," and all amounts alleged to be "approximately:"

### The Charity

1.     **PREFERRED FAMILY HEALTHCARE, INC.** ("PFH") was a Missouri nonprofit corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Greene County, Missouri, within the Western District of Missouri.   PFH and its subsidiaries provided a variety of services to individuals in Missouri, Arkansas, Kansas, Oklahoma and Illinois, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services.

2.     Originally, and for most of its existence, PFH was known as **ALTERNATIVE OPPORTUNITIES, INC.** ("AO"), a Missouri nonprofit corporation headquartered at 1111 South Glenstone Avenue, in Springfield, Missouri.   AO filed its Articles of Incorporation with the

Missouri Secretary of State on December 3, 1991, and was granted corporate charter no. N00045067. On April 23, 2015, AO entered into an Agreement and Plan of Merger with Preferred Family Healthcare, Inc., of Kirksville, Missouri (Missouri corporate charter no. N00024607), under which PFH was the "Surviving Corporation" and AO was the "Non-Surviving Corporation," meaning that the post-merger entity retained PFH's name and corporate registration. On May 1, 2015, **PREFERRED FAMILY HEALTHCARE, INC.** (Missouri corporate charter no. N00024607) was registered with the Missouri Secretary of State. (Hereinafter, "the Charity" shall refer to AO and PFH over all times material to this Information, disregarding the Kirksville, Missouri-based Preferred Family Healthcare, Inc., which existed prior to May 2015, and is not relevant to this Information.)

3.    Both AO and PFH were recognized by the Internal Revenue Service (IRS) as non-profit public charities under Section 501(c)(3) of the Internal Revenue Code (United States Code, Title 26). AO applied for and was granted exemption from federal income tax under Internal Revenue Code Section 501(a)(2) as an organization described in Internal Revenue Code Section 501(c)(3) by Internal Revenue Service Letter 1045 dated August 25, 1993. AO's Articles of Incorporation, attached to its application for tax-exempt status, stated that the corporation's purpose was "[t]o provide supportive and alternative opportunities for individuals with mental retardation/developmental disabilities and other special needs. The organization is organized exclusively for charitable purposes within the meaning of Section 501(c)(3) of the Internal Revenue Code." AO's By-Laws, also attached to its application for tax-exempt status, stated:

> The purpose for Alternative Opportunities, Inc. (AO) shall be to provide human services to include, but not be limited to, individual supported living, supported employment, community integration, and home management for persons who include, but are not limited to, the mentally retarded and developmentally disabled.

4.    For the fiscal years 2008 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity had total revenue in the amounts indicated below:

| Fiscal Year | Entity | Total Revenue |
|---|---|---|
| FY2008 | AO | $    68,696,111 |
| FY2009 | AO | $    63,847,299 |
| FY2010 | AO | $    64,779,466 |
| FY2011 | AO | $    77,271,030 |
| FY2012 | AO | $    77,112,631 |
| FY2013 | AO | $    90,033,026 |
| FY2014* | AO | $    89,844,968 |
| FY2014 | PFH | $    66,264,806 |
| FY2015 | PFH | $  127,276,627 |
| FY2016 | PFH | $  180,737,583 |
| | Total: | $  905,863,547 |

* For AO, FY2014 ended 04/30/2015 because AO merged with the
Kirksville, Missouri based Preferred Family Healthcare, Inc.

5.    For the calendar years 2011 through 2016, the Charity received Medicaid reimbursements from the states of Arkansas, Kansas, Missouri, and Oklahoma, in the amounts indicated below:

| Medicaid Reimbursement by State (Total Reimbursements) | | | | |
|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $  22,917,095 | $     114,653 | $  12,051,231 | $  5,984,647 | $  35,082,979 |
| 2012 | $  26,275,165 | $     102,540 | $  13,679,546 | $  7,323,957 | $  40,057,252 |
| 2013 | $  28,843,342 | $  1,012,503 | $  14,411,117 | $  8,977,498 | $  44,266,962 |
| 2014 | $  32,017,605 | $     966,043 | $  18,540,234 | $ 10,040,355 | $  51,523,882 |
| 2015 | $  35,521,005 | $     918,288 | $  32,424,388 | $ 10,000,473 | $  68,863,682 |
| 2016 | $  33,403,414 | $     934,368 | $  58,494,910 | $  9,857,786 | $  92,832,692 |
| Total | $ 178,977,627 | $ 4,048,395 | $149,601,427 | $ 52,184,716 | $ 384,812,165 |

| Medicaid Reimbursement by State (Federal Portion) | | | | |
|---|---|---|---|---|
| | Arkansas | Kansas | Missouri | Oklahoma | Total |
| 2011 | $  16,355,931 | $     67,703 | $  7,627,224 | $  3,886,430 | $ 24,050,858 |
| 2012 | $  18,579,169 | $     58,356 | $  8,679,672 | $  4,678,544 | $ 27,317,197 |

3

| Medicaid Reimbursement by State (Federal Portion) | | | | |
|---|---|---|---|---|
| 2013 | $ 20,227,835 | $ 572,166 | $ 8,844,102 | $ 5,745,599 | $ 29,644,103 |
| 2014 | $ 22,444,341 | $ 549,775 | $ 11,500,507 | $ 6,427,835 | $ 34,494,624 |
| 2015 | $ 25,177,289 | $ 520,026 | $ 20,573,248 | $ 6,230,295 | $ 46,270,563 |
| 2016 | $ 23,382,390 | $ 522,872 | $ 37,015,579 | $ 6,012,264 | $ 60,920,841 |
| Total | $ 126,166,955 | $ 2,290,898 | $ 94,240,332 | $ 32,980,967 | $255,679,153 |

6.     For the fiscal years 2010 through 2015, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity received at least $53,411,253 in funds from the Federal government, more particularly, the Departments of Health and Human Services ("HHS"), Labor ("DOL"), Veterans Affairs ("VA"), Housing and Urban Development ("HUD"), Justice ("DOJ"), and Agriculture ("USDA"), under programs involving grants, contracts, loans, guarantees, insurance, and other forms of Federal assistance, broken down by fiscal year (ending June 30), in the following amounts:

| | HHS* | DOL | VA | HUD | DOJ | USDA |
|---|---|---|---|---|---|---|
| FY2010 | $ 848,054 | $ 3,122,098 | $ - | $ - | $ - | $ 9,295 |
| FY2011 | $ 1,368,239 | $ 3,488,094 | $ 381,266 | $ 33,403 | $ - | $ 9,330 |
| FY2012 | $ 1,731,955 | $ 3,145,749 | $ 352,841 | $116,906 | $ - | $ 9,213 |
| FY2013 | $ 2,500,587 | $ 3,324,939 | $ 377,969 | $ 89,455 | $ - | $ - |
| FY2014 (AO)** | $ 4,340,302 | $ 2,638,085 | $ - | $ - | $304,672 | $ - |
| FY2014 (PFH) | $ 6,888,549 | $ 780,862 | $ 62,328 | $ 99,248 | $ - | $ 80,348 |
| FY2015 | $12,312,338 | $ 4,637,628 | $ 73,300 | $102,273 | $ 39,868 | $142,059 |
| Total | $29,990,024 | $21,137,455 | $1,247,704 | $441,285 | $344,540 | $250,245 |

* Not including Medicaid reimbursement.

** For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

7.     The term "Resource Team," often abbreviated "RT," was used within the Charity to refer to the Charity's executive leadership. The composition of the Resource Team changed slightly over time, but throughout the period relevant to this Information the Resource Team

4

included "Person #1," who was the Chief Financial Officer ("CFO"), "Person #2," who was the Chief Operating Officer ("COO"), "Person #3," who was the Chief Executive Officer ("CEO"), and "Person #5," who was the Chief Clinical Officer ("CCO").

## Persons

8.      "Person #1," a resident of Springfield, Missouri, and Boulder, Colorado, was one of the original founders of the Charity.  Person #1 was the Charity's Chief Financial Officer, and had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

9.      "Person #2," a resident of Springfield, Missouri, and Boulder, Colorado, began working for the charity in 1994.  Person #2 was the Charity's Chief Operating Officer, and served as the chief administrator over personnel in all programs and services.  Person #2 had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

10.     "Person #3," a resident of Springfield, Missouri, began working at the charity in 1992.  Person #3 was the Charity's Chief Executive Officer, and oversaw the Charity's lobbying and governmental affairs activities.  Person #3 had authority to approve and direct payments of funds and enter into agreements on behalf of the Charity.

11.     "Person #4," a resident of Rogers, Arkansas, was a lobbyist registered with the Arkansas Secretary of State.  Person #4 also was an employee of the Charity, serving as an executive for company operations in the state of Arkansas.  Person #4 also operated the entities identified below as "Lobbying Firm A" and "Lobbying Firm B."

12.     "Person #5," a resident of Springfield, Missouri, was a Licensed Psychologist and Certified Substance Abuse Counselor.  Person #5 was a consultant for the Charity before joining the Charity in 1994, and thereafter held the position of Chief Clinical Officer, the Charity executive

responsible for overseeing clinical operations and the provision of services. Person #5 was responsible for quality control matters for the Charity's services, assisted in drafting the Charity's grant proposals involving clinical and medical grants, and was a signatory on the Charity's bank accounts.

13. The defendant, **EDDIE WAYNE COOPER** ("Cooper") was an Arkansas State Representative from 2006 through January 2011, and a lobbyist registered with the Arkansas Secretary of State from January 20, 2011 onward. On April 20, 2009, the Charity hired Cooper as a full-time employee, with the job title of "Regional Director." Cooper's employment with the Charity ended on April 26, 2017. For the years 2009 through 2016, the Charity paid Cooper wages totaling $723,644. From October 2009 through April 2015, Cooper also was a member of AO's Board of Directors. Cooper also worked for Lobbying Firm A as a lobbyist, and received payments from Lobbying Firm A as a contract employee.

14. Donald Andrew Jones, also known as "D.A." Jones ("Jones"), charged separately, was a resident of Willingboro, New Jersey and a Philadelphia, Pennsylvania-based political operative. Jones owned and operated the firm, D.A. Jones & Associates, which purported to provide political and advocacy services, including consulting, analysis, and public relations.

15. "Person #12" was both a Charity employee and on the payroll of Lobbying Firm A.

**Entities**

16. "Entity A" was a Missouri limited liability company that was used as the management company for AO. Entity A was formed in 1995 by Person #1, Person #2, Person #3, Person #5, and three of their associates. In 2006, Entity A was sold to a publicly-traded corporation by its five remaining owners, including Person #1, Person #2, Person #3 and Person #5; however, Person #1 continued to exercise actual control over the bank accounts and activities of Entity A.

17.     "Entity E" was a Missouri S-corporation that was in the business of re-packaging and selling indoor thermostats imported from China. Entity E was formed in 2006, using funds Person #1 and Person #2 received from the sale of Entity A to a publicly traded corporation. Person #1 and Person #2 owned a combined 45.1086 percent share of Entity E, and a relative of Person #2 owned another 45.1086 percent.

18.     "Lobbying Firm A" was an Arkansas C-corporation and lobbying organization registered with the Arkansas Secretary of State. Lobbying Firm A was solely owned and operated by Person #4, and purported to provide political services, including lobbying, consulting, and advocacy.

19.     "Lobbying Firm B" was a lobbying organization registered with the Arkansas Secretary of State, which listed a family member of Person #4 as its authorized representative. On February 5, 2013, Person #4 opened a bank account at Bancorp South in the name of Person #4 doing business as Lobbying Firm B.

20.     Dayspring Behavioral Health Services ("Dayspring") was an Arkansas limited liability company providing behavioral health services, which was acquired by AO in 2007 and thereafter continued as a business alias of the Charity. Doing business as Dayspring, the Charity operated dozens of clinics throughout the state of Arkansas, offering a variety of behavioral health services to individuals, families, and groups.

**Laws and Regulations Pertaining to Section 501(c)(3) Organizations**

21.     The Internal Revenue Service ("IRS") was an agency of the United States Department of Treasury, responsible for the ascertainment, computation, assessment, and collection of taxes owed to the United States Treasury by individuals, corporations and other entities. One of the IRS's missions was to oversee the operation of organizations exempt from

7

income tax under Section 501(c)(3) of the Internal Revenue Code (Title 26 of the United States Code).

22.     Section 501(c)(3) of the Internal Revenue Code granted authorized charitable organizations tax-exempt status, which exempted them from having to pay any income tax on the donations they received. Entities eligible for tax-exempt status were described as follows:

> Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals, no part of the net earnings of which inure[d] to the benefit of any private shareholder or individual, no substantial part of the activities of which [was] carrying on propaganda, or otherwise attempting, to influence legislation . . . and which [did] not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

23.     To qualify for exemption, an organization was required to file an IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code. In this application, signed under penalties of perjury, the organization was required to demonstrate that it was organized and operated exclusively for charitable exempt purposes, and any non-exempt purpose was be incidental and not substantial to its operation.     Upon approval, the IRS would issue a determination letter that provided written assurance of the organization's tax-exempt status, and its qualification to receive tax-deductible charitable contributions.     Every organization qualifying for exemption under section 501(c)(3) would also be classified as either a "public charity" or a "private foundation."

24.     In accomplishing its oversight mission, the IRS primarily relied upon information reported annually by each tax-exempt organization. Additionally, in determining an organization's entitlement to tax-exempt status, the IRS utilized information provided by tax exempt

organizations in response to specific IRS inquiries, information provided by other federal and state agencies, and members of the public.

25.     After the IRS granted an organization tax-exempt status, the organization was required to file an informational return, Form 990, "Return of Organization Exempt from Income Tax" each year in which an organization had gross receipts greater than or equal to $200,000 or total assets greater than or equal to $500,000. The return was signed under penalties of perjury. Form 990 was an annual information return required to be filed with the IRS by most organizations exempt from income tax under section 501(a), and certain political organizations and nonexempt charitable trusts. Parts I through XII of the form were required to be completed by all filing organizations, and required reporting of the organization's exempt and other activities, finances, governance, compliance with certain federal tax filings and requirements, and compensation paid to certain persons. Additional schedules were required to be completed depending upon the activities and type of the organization. By completing Part IV, the organization determined which schedules were required. The entire completed Form 990 was filed with the IRS, except for certain contributor information on Schedule B (Form 990, 990-EZ, or 990-PF), which was required to be made available to the public by the IRS and the filing organization, and also could be required to be filed with state governments to satisfy state reporting requirements.

26.     Section 501(c)(3) organizations were required to report excess benefit transactions on Forms 990. The following definitions, set forth in the Internal Revenue Code, applied to this requirement:

> a.     The term "excess benefit transaction" meant any transaction in which an economic benefit was provided by the tax-exempt organization directly or indirectly to or for the use of any disqualified person if the value of the economic benefit provided exceeded the value of the consideration (including the performance of services) received for providing such benefit. For purposes of the preceding sentence, an

economic benefit was not to be treated as consideration for the performance of services unless such organization clearly indicated its intent to so treat such benefit.

b.  Any person who was in a position to exercise substantial influence over the affairs of the applicable tax-exempt organization at any time during the five-year period ("lookback period") prior to the date of such transaction was a "disqualified person."

c.  The term "disqualified person" also included family members such as spouses, children, and siblings by whole or half-blood of disqualified persons.

d.  The term "disqualified person" also included any "35-percent controlled entity," which included any corporation in which disqualified persons own more than 35 percent of the total combined voting power.

27.  Section 501(c)(3) organizations were required to disclose the existence of excess benefit transactions on page four (4) of IRS Form 990, by responding "yes" or "no" to questions 25(a) and 25(b) – disclosing whether they had such transactions in the current period, or had discovered past such transactions.  If the organization answered either question in the affirmative, it was required to describe the excess benefit transaction(s) in Schedule L Part I of the Form 990.

28.  Section 501(c)(3) organizations were absolutely prohibited from directly or indirectly participating in, or intervening in, any political campaign on behalf of, or in opposition to, any candidate for elective public office.  Contributions to political campaign funds violated this prohibition, and could have resulted in denial or revocation of tax-exempt status and the imposition of certain excise taxes.

29.  Further, organizations not considered "electing organizations" (those making an election under Section 501(h), which election the Charity did not make) were subject to the "No Substantial Part" rule, which provided that no substantial part of the organization's activities could constitute carrying on propaganda, or otherwise attempting to influence legislation.  So the IRS

and the public could monitor tax-exempt organizations' compliance with the "No Substantial Part" Rule, Section 501(c)(3) organizations not making an election under Section 501(h), including the Charity, were required to disclose any and all lobbying activity in Part IX (Statement of Functional Expenses) of their annually-filed IRS Forms 990.

30.     Finally, all organizations seeking exemption under Section 501(c)(3) were required to conform to certain fundamental legal principles applicable to all charitable organizations.  One such principle was that charitable organizations could not engage in behavior that was illegal or violated public policy.  The "illegality doctrine" derived from English charitable trust law, the legal foundation on which Section 501(c)(3) was established.  Under charitable trust law, trusts violating law or public policy could not qualify for charitable status.

### The Charity's IRS Forms 990

31.     For the fiscal years 2008 through 2016, each fiscal year beginning July 1 of the indicated year, and ending on June 30 of the following year, the Charity filed IRS Forms 990 as set forth below:

| Entity | Period | Form 990 Due Date | Form 990 Filed Date | Officer's signature |
|--------|--------|-------------------|---------------------|---------------------|
| AO | FY2008 | 05/15/2010 | 05/17/2010 | Person #1 |
| AO | FY2009 | 05/15/2011 | 05/16/2011 | Person #3 |
| AO | FY2010 | 05/15/2012 | 05/15/2012 | Person #1 |
| AO | FY2011 | 05/15/2013 | 05/15/2013 | Person #1 |
| AO | FY2012 | 05/15/2014 | 05/15/2014 | Person #1 |
| AO | FY2013 | 05/15/2015 | 05/13/2015 | Person #1 |
| AO | FY2014 | 05/15/2016 | 03/15/2016 | Person #1 |
| PFH | FY2014 | 05/15/2016 | 05/16/2016 | Person #1 |
| PFH | FY2015 | 05/15/2017 | 05/15/2017 | Person #1 |

32.     On each IRS Form 990 listed above, the Charity answered "no" to questions 25(a) and 25(b), representing that it had no excess benefit transactions in the current period, and had discovered no past such transactions.

33.    In Part IX (Statement of Functional Expenses) of each IRS Form 990 listed above, the Charity reported that it had expenses related to lobbying and political activity in the amounts set forth below:

|  | Line 11a[2] | Schedule C, Part II-B, Line 1f[3] | Schedule C, Part II-B, Line 1g[4] | Line 18[5] |
|---|---|---|---|---|
| FY2010 | $0 | $0 | $54,000 | $0 |
| FY2011 | $0 | $0 | $78,248 | $0 |
| FY2012 | $0 | $0 | $185,010 | $0 |
| FY2013 | $0 | $843,700 | $48,000 | $0 |
| FY2014 (AO)[1] | $109,254 | $0 | $109,254 | $0 |
| FY2014 (PFH) | $134,600 | $0 | $0 | $0 |
| FY2015 | $451,646 | $0 | $0 | $0 |

[1] For AO, FY2014 ended 04/30/2015 because AO merged with the Kirksville, Missouri based Preferred Family Healthcare, Inc.

[2] Line 11a:  Lobbying.

[3] Schedule C, Part II-B, Line 1f:  Grants to other organizations for lobbying purposes.

[4] Schedule C, Part II-B, Line 1g:  Direct contact with legislators, their staff, government officials, or a legislative body.

[5] Line 18:  Payments of travel or entertainment expenses for any federal, state, or local public officials.

## Object of the Conspiracy

34.    From October, 2009, until February 2017, in Greene County, Missouri, in the Western District of Missouri, and elsewhere, the defendant, **EDDIE WAYNE COOPER**, conspired and agreed with Person #1, Person #2, Person #3, Person #4, Donald Andrew Jones, and with others known and unknown to the United States Attorney, to execute a scheme whereby Person #1, Person #2, Person #3, and Person #4, being agents of Alternative Opportunities, Inc., and Preferred Family Healthcare, Inc., organizations receiving in each one-year period from July 1, 2009, through June 30, 2017, benefits in excess of $10,000 under the Federal programs set forth above, embezzled, stole, obtained by fraud, and without authority knowingly converted to their use, property worth at least $5,000 and under the care, custody, and control of such

12

organization, that is, funds totaling more than four million dollars; in violation of Title 18, United States Code, Section 666(a)(1)(A) and (a)(2).

**Manner and Means**

35.     The manner and means by which the conspirators achieved and attempted to achieve the object of the conspiracy included but were not limited to the following:

36.     Person #1, Person #2, Person #3, and Person #4 devised and executed multiple schemes to embezzle, steal, and unjustly enrich themselves to the detriment of the Charity's mission.  As a part of these schemes, Person #1, Person #2, Person #3, and Person #4, used the Charity's funds for unlawful political contributions and excessive, unreported lobbying and political advocacy, to the financial benefit of the Charity, and themselves.

37.     Person #1, Person #2, and Person #3, through its lobbyists and advocates, including Person #4 and Cooper operating as Lobbying Firm A, and Jones, would and did cause the Charity to contribute financially to elected officials and their political campaigns, which indirect contributions were prohibited by law just as if the payments had been made by the Charity directly.

38.     In order to provide a veneer of legitimacy for the unlawful payments to others, and kickbacks paid to themselves, and to disguise the nature and source of the payments, Person #1, Person #2, Person #3, and Person #4 would and did cause the books, records, and public disclosures of the Charity to misrepresent, conceal, and cover up the nature of the services provided by the elected public officials, lobbyists and advocates, and financial contributions to elected public officials and their political campaigns, by falsely describing such payments being for training and consulting, and by causing the Charity to execute sham consulting agreements, training agreements, and agreements for other services.

39.     Person #1, Person #2, Person #3, and Person #4 would and did instruct the persons providing the advocacy services to submit – and for persons employed by the Charity to create internally – invoices seeking payment from the Charity for services falsely described as "training" and "consulting," that were in truth and in fact lobbying, advocacy work, and funds provided to Person #1, Person #4, and Cooper as kickbacks.

*Payments/Kickback Scheme with Lobbying Firm A*

40.     The Charity paid Lobbying Firm A to provide lobbying and advocacy services. Doing business as Lobbying Firm A, from 2010 through 2017, Person #4, Cooper, and others, known and unknown, solicited the assistance of elected and appointed officials regarding legislative issues that impacted the Charity, in particular matters involving the Charity, and in steering grants and other sources of funding to the Charity. These funding sources included proceeds from the Arkansas General Improvement Fund ("GIF").

41.     From 2010 to 2017, Person #1, Person #2, and Person #3 would and did cause the Charity to disburse funds to Lobbying Firm A. During this time period, the Charity, directly and through its related for-profit corporations, paid Lobbying Firm A more than three million dollars.

42.     Person #1, Person #2, and Person #3 caused the checks to Lobbying Firm A to be falsely classified as a consulting expense in the books and records of the Charity, when in truth and in fact the checks were payments for Person #4's and Cooper's advocacy services, including direct contact with elected and appointed public officials, and for kickbacks paid to Person #1.

43.     For the years 2010 through 2015, Person #4 paid kickbacks to Person #1, by way of checks totaling $640,500, and on numerous additional occasions, in cash.

44.     For the years 2010 through 2016, Lobbying Firm A reported to the IRS that it paid Cooper a total of $387,501.

*Payments/Kickback Scheme with Donald Andrew Jones*

45.     In or about 2011, Jones entered into an agreement with Person #1, Person #2, Person #3, and Person #4 that he would provide advocacy services for the Charity, including direct contact with legislators, legislators' offices, and government officials, in order to influence elected and appointed public officials to the financial benefit of the Charity.

46.     From 2011 through January 2017, Jones solicited the assistance of elected and appointed officials regarding legislative issues that impacted the Charity, in particular matters involving the Charity, and in attempting to steer grants and other sources of funding to the Charity.

47.     In exchange for Jones's services, the Charity made payments to D.A. Jones & Associates. In order to conceal the nature and source of some of the funds the Charity paid to Jones, Person #1, Person #2 and Person #3 caused some of those payments to be routed through Entity A, Lobbying Firm A, and Lobbying Firm B.

48.     Also, in order to conceal the nature of the services for which they caused the Charity to contract, Person #1, Person #2, Person #3, and Person #4 described the services provided by Jones as "consulting" services, and the payments made to Jones as payments pursuant to a "consulting agreement." Initially, and for more than four years, the conspirators did not put their agreement in writing. On January 1, 2016, Person #3, on behalf of PFH, and Jones executed a sham "consulting agreement." While the main body of the "consulting agreement" listed duties generally consistent with those of a professional hired as a consultant, an unsigned Appendix A more particularly described Jones's duties not as consulting services, but as advocacy.

49.     Jones paid kickbacks to Person #4, primarily by checks made payable to Person #4 or to Lobbying Firm A or Lobbying Firm B. Also, at the request of Person #4, Jones would and did make two payments to Cooper.

50. Also, Person #1 and Person #2 directed Jones to perform advocacy services on behalf of their for-profit corporation, Entity E, for which Entity E did not compensate Jones. Jones assisted Person #1 and Person #2 with various issues involving Entity E, including possible relocation to Pennsylvania, attempts to secure federally subsidized state funding through the Weatherization Assistance Program, attempts to secure robotics funding, outreach to potential clients, and a June 2017 issue involving a shipment of thermostats from China that was being held by U.S. Customs in Kansas City, Missouri.

51. From time to time, Jones suggested that Person #1, Person #2, and Person #3 make political contributions to legislators he and they wanted to influence and/or thank for assistance. From time to time, Jones agreed with Person #1, Person #2, and Person #3 that he would and did deliver their contribution checks directly to the legislators in Washington D.C., to increase the impact of the donations.

52. Between February 28, 2011, and December 14, 2016, Person #1, Person #2, Person #3, and Person #4 caused the Charity to pay to Jones $973,807.28, both via direct payments and through Entity A, Lobbying Firm A, and Lobbying Firm B.

53. Between January 12, 2012, and January 17, 2017, Jones paid Person #4 kickbacks totaling $219,000, by way of checks payable to Person #4 and Lobbying Firm A. Additionally, at the direction of Person #4, Jones paid Cooper kickbacks of $25,000 on January 8, 2013, and $20,000 on December 26, 2013.

54. On January 18, 2012, Person #4 caused Lobbying Firm A to issue a check in the amount of $18,000 to Cooper, constituting Cooper's share of Jones's January 2, 2012, kickback payment.

*Concealment and False Statements*

55.     Concealment of the schemes was an integral and necessary part of the conspiracy. Person #1, Person #2, Person #3, Person #4, Cooper, and others known and unknown to the United States Attorney, utilized the Charity's tax-exempt status to facilitate their embezzlement, theft, and unjust enrichment of themselves; in order to maintain said tax-exempt status they concealed, covered up, and falsified evidence of their embezzlement, unjust enrichment, and excess benefit transactions to themselves and others, and of their unlawful use of the Charity's funds for the payment of bribes, for political contributions and excessive and undisclosed lobbying and political advocacy.

56.     It was a part of their concealment of their crimes that Person #1, Person #2, and Person #3, in order to obtain approval of or ratification for transactions and agreements, caused presentations to the Charity's Board of Directors to contain false statements and material omissions.

57.     In his capacity as a member of the Charity's Board of Directors, and his service on the Board's finance committee, Cooper assisted Person #1, Person #2, and Person #3 in their concealment by voting to authorize and ratify transactions and agreements based upon presentations he knew contained false statements and material omissions, and by opposing attempts by other Board members to more carefully scrutinize the Charity's operations.

## Overt Acts

58.     In furtherance of the conspiracy, and to accomplish its objects, defendant **EDDIE WAYNE COOPER**, Person #1, Person #2, Person #3, Person #4, Donald Andrew Jones, and others known and unknown to the United States Attorney, committed the following overt acts, among others, in the Western District of Missouri and elsewhere:

*Lobbying Firm A*

59.     On February 22, 2010, Person #4 emailed Person #1 and Person #2 and courtesy copied Cooper, who was then an elected public official, and one other person, regarding an issue with bundled Medicaid billing and how they should approach it.  The email states, in part, "We have placed Medicaid on the agenda for Public Health Committee, thanks to our very own Cooper and ["Arkansas Representative A" and one other person]."

60.     On August 24, 2010, Cooper, while serving as an elected public official, emailed Person #4 letting him know he had heard from a source that the Governor was going to lift a moratorium on RSPMI providers, which would allow public schools to bill Medicaid.  Cooper further stated that source was, "…going to snoop around and see what he could find out."  Cooper then stated, "I really don't know what he is looking for but I do have concerns about anyone snooping around our Medicaid contacts."  Person #4 forwarded this message from Cooper to Person #1, whose email response consisted of an expletive.

61.     On October 24, 2010, Person #4 emailed "Arkansas Representative B," asking about the meeting time for the RSPMI Policy Work Group, and stated that, "Rep. Cooper is on the committee and he is carrying my vote to follow your lead."  Person #4 then forwarded the message to Cooper stating, "Here it is."

62.     On October 20, 2010, Cooper emailed Person #4 scanned images of two items:  a check written to a political candidate for $500, with the word "Donation" in the memo section; and a receipt from a restaurant in Texarkana, Arkansas, for $2,851.07, roughly half of which was spent on food and the other half on alcoholic beverages (115 separate drink items) and gratuity.

63.     On October 22, 2010, Person #4 forwarded the email with the scanned items to Person #1, stating, "this is one of coopers."

64.     Also on October 20, 2010, Person #1 replied, via email, to Person #4 stating, "That one is going to be tough to pay out of AO. Can you send me a [Lobbying Firm A] bill for that and I will FedEx you a [Lobbying Firm A] check for about that amount or a little over. So it is the $500 plus the dinner receipt?"

65.     Also on October 22, 2010, Person # 4 emailed Person #1, stating, "will do."

66.     On February 27, 2011, Person #4 emailed Cooper and Arkansas Representative A with the subject line, "GIF," stating:

> Each of us divided up Members of the Legislature several weeks ago. I have all those Legislature that had us draft bills. We know the out look of the House is not good. I need a report on everyone's Senator that has not had bills drafted and what Rep. [redacted] and [redacted] final word is for us. We can meet at the office around 6:00 - 6:30 Monday evening at the office. In our report we have to draft for the Resource Team we have to know what each Senator final word is. We have froze all spending until we know were we are with the House.
> Example:
> (1) Senator [redacted] did not do a bill, but he has committed to adding funds to Senator [redacted] bill.
> (2) Senator [redacted] will be adding funds to Senator [redacted] bill.
> Will see you there."

67.     On October 10, 2011, Cooper emailed Person #4 and courtesy copied Person #2, Person #3, Person #5, and Person #12. Cooper provided an update regarding the potential lifting of the RSPMI moratorium and stated, "Arkansas has 243 school districts that could potentially operate their own RSPMI service if this policy is adopted" and, "[o]ne thing about this Draft that really troubles me is that they have included the Educational Service Cooperatives as a possible School Run RSPMI Provider." Cooper also congratulated Person #12 for his/her being on the Governor's Commission on Children's Mental Health, and stated that the point of his email was to provide information to Person #12 before his/her first commission meeting.

68.     On November 28, 2011, Person #4 emailed Cooper, Arkansas Representative A Arkansas Representative C, and courtesy copied Person #2, stating, "Please read through this info, this is what we can not [sic] have happen if they try to bring this to the Legislature." The attached document, entitled, "Healthy Children = Successful Students," discussed a proposal to permit the state's Educational Service Cooperatives to bill as possible school-run RSMPI providers, providing health care services that could have competed with the Charity.

69.     Person #4 told Cooper he/she "had good news and bad news." The "good news" was that "we've picked up AO as a client," meaning the Charity had retained Lobbying Firm A to provide lobbying services in Arkansas. The "bad news" was that Person #1 "wants half the money, he's gonna lobby, so there's no money in it for you," meaning that Person #1 would get half of the Charity's payments to Lobbying Firm A, and there would be no additional income to Cooper from the arrangement.

70.     On January 27, 2013, Person #4 sent Cooper and one other person an email, with attachment, having the subject line, "Our Bill," stating that they have added two more senators to the bill. Person #4 then forwarded the same message, with additional correspondence, to Cooper alone, instructing Cooper to meet with five additional senators about a related "bill we have to kill."

71.     On May 20, 2013, Person #1 emailed Person #4, stating, in part, "Hey where are you tomorrow, am going to send you $150k today. Send me $75k overnight. Figure $25k tax so we net $50k. Our story is we got $50k."

72.     Person #1 issued check #2117, dated May 21, 2013, drawn on Entity A's Bank of Bolivar account ending in 3101, payable to Lobbying Firm A in the amount of $150,000.

73.     On May 22, 2013, Person #4 caused Entity A's check #2117 to be deposited in Lobbying Firm A's Bancorp South account ending in 2316.

74.     Person #4 issued check #2170, dated May 20, 2013, drawn on Lobbying Firm A's Bancorp South account ending in 2316, payable to Person #1 in the amount of $75,000.

75.     On May 23, 2013, Person #1 caused Lobbying Firm A's check #2170 to be deposited in his/her Metropolitan Bank account ending 9278.

76.     On December 2, 2013, Person #1 emailed Person #4, stating, "awesome on the mil."

77.     Also on December 2, 2013, Person #4 emailed Person #1, stating, "Thanks brother."

78.     Also on December 2, 2013, Person #1 emailed Person #4, stating, "Santa is coming."

79.     Also on December 2, 2013, Person #4 emailed Person #1, stating, "I need Santa."

80.     On December 6, 2013, Person #2 emailed Person #4 and courtesy copied Person #1, stating, in part:

> I talked to [Person #1] about the GIF issue today. Would you please discuss it with him in more detail.
>
> I took the initiative to talk to [Person #3] and [Person #3] is comfortable with the last verbal agreement we had.
>
> If you don't feel that is reasonable, please let me know and we will try to work something else.
>
> On Thursday we all need to discuss what agreements are in place if we pursue GIF again next year, so neither [Person #1] and you, or I, will be disappointed. I believe [Person #3] will be okay with whatever I propose to [Person #3].

81.     Also on December 6, 2013, Person #1 replied, via email, to Person #3, courtesy copied Person #4, stating "There isn't any next year."

82. On December 7, 2013, Person #4 replied, via email, to Person #1, courtesy copied Person #2, stating "Hey bubba, I will call you later today to discuss what I would like to see done and I think it's a good plan that will be good from all areas."

83. Also on December 7, 2013, Person #1 replied, via email, to Person #4, stating "Don't include [Person #2] on email. I am out of the loop on GIF. I know it is supposed to be 10%."

84. On June 5, 2014, Person #1 texted Person #4, stating, in part, "Hey from now on just send me 30% cash and you keep the rest for tax on [Lobbying Firm A] stuff. That gives you 40% of my half for tax. That way I don't get 1099 and you aren't short on tax."

85. On June 26, 2014, Person #1 texted Person #4, stating, "At 30% I think about $28,500 roughly. I think the total was $95k or $96k. That leaves you 40% of my half for taxes. I can give you exact later."

86. Also on June 26, 2014, Person #4 texted Person #1, stating, "Ok brother I think I can send 15 no problem bubba."

87. Also on June 26, 2014, Person #1 texted Person #4, stating, "Ok. No problem."

88. Also on June 26, 2014, Person #4 texted Person #1, stating, "May call you later or in the am. Gona [sic] send the package so u [sic] get by Tuesday. Ok. Call u in a bit."

89. Also on June 26, 2014, Person #1 texted Person #4, stating, "I am in Springfield Tuesday. 1111 S. Glenstone, Suite 3-100, Springfield MO 65804."

90. On January 5, 2015, Person #1 sent an email to Person #4, stating, in part, "Tell me where to send the FedEx. I opened the check and the amount is $142,750 so is correct."

91. Also on January 5, 2015, Person #4 replied, via email, to Person #1 containing a physical address located in Arkansas.

92.    Also on January 5, 2015, Person #1 replied, via email, to Person #4, stating "OK, be sure and send me $100k on that one.  We will work out the difference later.  Thank you."

*Payments/Kickback Scheme with Donald Andrew Jones*

93.    On each of the dates set forth below, Person #1, Person #2, Person #3, and Person #4 caused the Charity to pay to Jones the amounts listed below, from or by way of the source accounts listed below:

|    | Date | Name on Source Account | Account no. (last 4) | Amount |
|----|------|------------------------|----------------------|--------|
| A  | 02/28/2011 | Person #4 dba Lobbying Firm B | 5171 | $2,000.00 |
| B  | 03/24/2011 | Lobbying Firm A | 2316 | $2,000.00 |
| C  | 04/09/2011 | Person #4 dba Lobbying Firm B | 5171 | $3,000.00 |
| D  | 12/15/2011 | Lobbying Firm A | 2316 | $4,000.00 |
| E  | 01/02/2012 | Entity A | 3101 | $72,000.00 |
| F  | 10/08/2012 | Dayspring | 8747 | $2,813.38 |
| G  | 01/01/2013 | Entity A | 3101 | $72,000.00 |
| H  | 01/01/2013 | Entity A | 3101 | $48,000.00 |
| I  | 01/18/2013 | Entity A | 3101 | $5,000.00 |
| J  | 04/17/2013 | Lobbying Firm A | 2316 | $3,000.00 |
| K  | 09/30/2013 | Alternative Opportunities, Inc. | 2595 | $60,000.00 |
| L  | 12/05/2013 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| M  | 01/24/2014 | Dayspring | 8747 | $1,786.42 |
| N  | 07/01/2014 | Alternative Opportunities, Inc. | 2595 | $30,000.00 |
| O  | 07/25/2014 | Lobbying Firm A | 2316 | $2,350.00 |
| P  | 08/22/2014 | Dayspring | 8747 | $1,000.00 |
| Q  | 12/01/2014 | Alternative Opportunities, Inc. | 2595 | $120,000.00 |
| R  | 02/03/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| S  | 03/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| T  | 03/17/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| U  | 03/30/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| V  | 04/03/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| W  | 04/06/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| X  | 04/09/2015 | Lobbying Firm A | 2316 | $7,500.00 |
| Y  | 04/21/2015 | Lobbying Firm A | 2316 | $8,500.00 |
| Z  | 04/22/2015 | Lobbying Firm A | 2316 | $6,500.00 |
| AA | 06/28/2015 | Lobbying Firm A | 2316 | $2,500.00 |

|    | Date | Name on Source Account | Account no. (last 4) | Amount |
|----|------|------------------------|----------------------|--------|
| BB | 07/17/2015 | Preferred Family Healthcare, Inc. | 3560 | $1,349.96 |
| CC | 08/18/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| DD | 08/18/2015 | Lobbying Firm A | 2316 | $10,000.00 |
| EE | 08/23/2015 | Lobbying Firm A | 2316 | $12,500.00 |
| FF | 08/23/2015 | Lobbying Firm A | 2316 | $2,500.00 |
| GG | 09/17/2015 | Preferred Family Healthcare, Inc. | 3609 | $991.80 |
| HH | 10/09/2015 | Preferred Family Healthcare, Inc. | 3587 | $1,200.00 |
| II | 10/29/2015 | Lobbying Firm A | 2316 | $15,000.00 |
| JJ | 11/17/2015 | Lobbying Firm A | 2316 | $5,000.00 |
| KK | 12/16/2015 | Preferred Family Healthcare, Inc. | 3587 | $150,000.00 |
| LL | 04/20/2016 | Preferred Family Healthcare, Inc. | 3587 | $5,000.00 |
| MM | 06/01/2016 | Preferred Family Healthcare, Inc. | 3587 | $1,315.72 |
| NN | 08/03/2016 | Lobbying Firm A | 2316 | $10,000.00 |
| OO | 12/14/2016 | Preferred Family Healthcare, Inc. | 3587 | $140,000.00 |
|    |      |                        | **Total:** | **$973,807.28** |

94.     On September 30, 2013, December 5, 2013, July 1, 2014, December 1, 2014, December 16, 2015, April 20, 2016, and December 14, 2016, Person #1, Person #2, and Person #3 caused the checks to Jones listed in the paragraph above to be falsely classified as a consulting expense in the books and records of the Charity, when in truth and in fact the checks were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

95.     On each of the dates set forth below, Jones paid kickbacks in the amounts set forth below to the persons and entities set forth below:

|    | Check/Wire Date | Deposit Date | Payee | Amount |
|----|-----------------|--------------|-------|--------|
| A | 01/02/2012 | 01/12/2012 | Lobbying Firm A | $36,000.00 |
| B | 01/20/2012 | 01/20/2012 | Lobbying Firm A | $2,000.00 |
| C | 10/26/2012 | 11/02/2012 | Person #4 | $1,000.00 |
| D | 01/01/2013 | 01/04/2013 | Person #4 | $27,000.00 |
| E | None | 01/08/2013 | **EDDIE WAYNE COOPER** | $25,000.00 |
| F | 10/01/2013 | 10/04/2013 | Person #4 | $20,000.00 |
| G | 10/01/2013 | 10/04/2013 | Lobbying Firm A | $20,000.00 |
| H | 12/26/2013 | 12/31/2013 | **EDDIE WAYNE COOPER** | $20,000.00 |

|   | Check/Wire Date | Deposit Date | Payee | Amount |
|---|---|---|---|---|
| I | 12/20/2013 | 01/03/2014 | Person #4 | $25,000.00 |
| J | 07/05/2014 | 07/24/2014 | Lobbying Firm B | $15,000.00 |
| K | 01/05/2015 | 01/07/2015 | Person #4 | $7,000.00 |
| L | 01/20/2015 | 01/21/2015 | Person #4 | $6,000.00 |
| M | 12/23/2015 | 01/26/2016 | Person #4 | $30,000.00 |
| N | 01/17/2017 | 01/17/2017 | Person #4 | $30,000.00 |
|   |   |   | **Total:** | **$264,000.00** |

96.     On January 18, 2012, Person #4 caused Lobbying Firm A to issue a check in the amount of $18,000 to Cooper.

*Concealment and False Statements*

97.     At the September 19, 2013, meeting of the Charity's Board of Directors, Cooper aided Person #2 and Person #1 in their opposition to another Board member's proposal that the Board hire an internal auditor who would report to the Board, by speaking against the proposal.

98.     At the February 19, 2015, meeting of the Charity's Board of Directors, Cooper voted to ratify certain related party transactions involving Person #1, Person #2, Person #3, and Lobbying Firm A, when Cooper then knew the presentations of Person #1, Person #2, and Person #3 regarding those transactions contained both false statements and material omissions.

All in violation of Title 18, United States Code, Section 371.

**Allegation of Forfeiture**

99.     The factual allegations of Paragraphs One through Seventy-Eight (1-78) of the Information are hereby re-alleged and fully incorporated herein for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Sections 981(a)(1)(C), 371, 666 and Title 28, United States Code, Section 2461.

100.     As a result of the offenses alleged in Count One of this Information, and pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section

2461, the defendant, **EDDIE WAYNE COOPER**, shall forfeit to the United States all property, real and personal, constituting, or derived from, proceeds traceable to the offenses, directly or indirectly, as a result of the violations of law, including but not limited to:

## Money Judgment

101.    A money judgment representing proceeds obtained by **EDDIE WAYNE COOPER** in that the sum in aggregate, constitutes or is derived from proceeds traceable to the offenses set forth in Count One.

## Substitute Assets

102.    If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred, sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be divided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p) as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of forfeitable property.

TIMOTHY A. GARRISON
United States Attorney

By: _____

STEVEN M. MOHLHENRICH
Assistant United States Attorney

DATED: 2/12/18
Springfield, Missouri

26